**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN DOE I; JOHN DOE II; JOHN DOE III, individually and on behalf of proposed class members; GLOBAL EXCHANGE, <br> *Plaintiffs-Appellants*, <br><br> v. <br><br> NESTLE USA, INC.; ARCHER DANIELS MIDLAND COMPANY; CARGILL INCORPORATED COMPANY; CARGILL COCOA, <br> *Defendants-Appellees*. | No. 10-56739 <br><br> D.C. No. 2:05-CV-05133-SVW-JTL <br><br> ORDER AND AMENDED ORDER |

Filed May 6, 2015
Amended June 10, 2015

Before: Dorothy W. Nelson, Kim McLane Wardlaw,
and Johnnie B. Rawlinson, Circuit Judges.

Order;
Amended Order;
Dissent by Judge Bea

# SUMMARY[*]

**Alien Tort Statute**

The panel denied a petition for panel rehearing and, on behalf of the court, a petition for rehearing en banc.

Dissenting from the denial of rehearing en banc, Judge Bea, joined by Judges O'Scannlain, Gould, Tallman, Bybee, Callahan, M. Smith, and N.R. Smith, wrote that the panel majority had substituted sympathy for legal analysis in concluding that the defendant corporations engaged in the Ivory Coast cocoa trade with the purpose that the plaintiffs be enslaved, hence aiding and abetting the slavers and plantation owners. Judge Bea wrote that the panel majority's conclusion was wrong, created a split with the Second and Fourth Circuits, and conflicted with Supreme Court doctrine interpreting the Alien Tort Statute.

# ORDER

The order denying the petition for rehearing/rehearing en banc, filed on May 6, 2015, is hereby amended at Page 2, Line 3, to add the sentence:

> Judges Graber, Ikuta, Watford, Owens, and Friedland did not participate in the deliberations or vote in this case.

**SO ORDERED.**

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## AMENDED ORDER

Judge Rawlinson voted to grant the petition for rehearing and petition for rehearing en banc.

Judge Nelson and Judge Wardlaw voted to deny the petition for panel rehearing. Judge Wardlaw voted to deny the petition for rehearing en banc and Judge Nelson so recommended.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

Judges Graber, Ikuta, Watford, Owens, and Friedland did not participate in the deliberations or vote in this case.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED**.

Judge Bea's dissent from the denial of rehearing en banc is filed concurrently with this order.

BEA, Circuit Judge, with whom O'SCANNLAIN, GOULD, TALLMAN, BYBEE, CALLAHAN, M. SMITH, AND N.R. SMITH, Circuit Judges, join, dissenting from the denial of rehearing en banc:

Unfortunately, the panel majority here has substituted sympathy for legal analysis. I quite agree plaintiffs are deserving of sympathy. They are alleged former child slaves of Malian descent, dragooned from their homes and forced to work as slaves on cocoa plantations in the Ivory Coast. But they do not bring this action against the slavers who kidnapped them, nor against the plantation owners who mistreated them. Instead the panel majority concludes that defendant corporations, who engaged in the Ivory Coast cocoa trade, did so with the *purpose* that plaintiffs be enslaved, hence aiding and abetting the slavers and plantation owners. By this metric, buyers of Soviet gold had the purpose of facilitating gulag prison slavery.

How was the cocoa buyers' purpose shown? By their purchase of cocoa and their conduct of "commercial activities [such] as resource development," conduct one of our sister circuits has explained does not establish that a defendant acted with the required purpose.[1] The panel majority's conclusion is wrong. Even the plaintiffs admit defendants intended only to maximize profits, not harm children through slavery.[2] It also creates a circuit split with the Second and Fourth Circuits.

---

[1] *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d. Cir. 2009).

[2] *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1025 (9th Cir. 2014).

But the consequences of the majority's decision do not end there—the majority leads us into open conflict with Supreme Court doctrine interpreting the Alien Tort Statute ("ATS"). The Court unequivocally requires that federal judges who are fashioning federal common law torts for violations of customary international law under the ATS operate under a "restrained conception" of the extent of such liability. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725–26 (2004). The panel majority flouts that requirement by permitting a broad expansion of liability under the ATS. The panel majority allows a single plaintiff's civil action to effect an embargo of trade with foreign nations, forcing the judiciary to trench upon the authority of Congress and the President. And in the process, the majority creates a second circuit split by misinterpreting the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659 (2013), as creating a new test for when the presumption against extraterritorial application of United States law is rebutted, rather than incorporating the settled doctrine of *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

For these reasons, our court should have corrected the panel's mistake by granting a hearing en banc, and I respectfully dissent from the order denying rehearing.

I begin by bringing to mind the basic principles of ATS litigation. The text of the ATS gives the federal district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Supreme Court has held that the ATS does not create a substantive tort action; instead, the statute is purely a grant of jurisdiction. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). ATS actions thus sound in federal common law. *Id.* But because

there are "good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind," an ATS claim must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id.* at 725–26.[3] Those "good reasons" include the general presumption against judge-made law, the paucity of early cases utilizing the ATS's jurisdictional grant, the disfavoring of court-created private rights of action, the risk that ATS litigation poses to the foreign relations of the United States, and the absence of an affirmative congressional mandate to engage in "judicial creativity" by crafting new norms. *Id.* at 726–28. Indeed, *Sosa* repeatedly emphasizes the need for restraint in extending liability to a defendant who is "a private actor such as a corporation or individual." *Id.* at 732 n.20.

As the majority opinion in this case recognizes, the Supreme Court's list of requirements for an ATS action is not exhaustive; instead, the *Sosa* opinion's standard "is suggestive rather than precise, and is perhaps best understood as the statement of a mood—and the mood is one of caution." *Doe*, 766 F.3d at 1019 (quoting *Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013, 1016 (7th Cir. 2011)). In light of its recognition of these principles, the majority's errors are all the more curious.

I turn now to the particulars of this case. Plaintiffs, alleged former child slaves who worked on cocoa plantations in the Ivory Coast, have sued the defendant chocolate companies on the theory that by purchasing the chocolate

---

[3] Those paradigms are "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa*, 542 U.S. at 724.

produced by Ivorian plantations, providing technical assistance[4] to the plantations, and lobbying Congress for a voluntary alternative to the mandatory "slave-free" licensing scheme Congress was considering, the defendants aided and abetted a violation of customary international law: child slavery.

I agree with the majority and the plaintiffs that child slavery is a violation of customary international law. And I further agree that aiding and abetting a crime is itself a crime, with its own *actus reus* and *mens rea* elements. The parties in this case dispute what is the correct *mens rea* standard for ATS aiding and abetting liability. Defendants claim that a showing that they acted purposefully to bring about (or maintain) the use of slavery to produce cocoa is required to confer liability. Plaintiffs claim that knowledge that slavery was so employed, together with acts of defendants which circumstantially benefit the slaver, is enough; specific intent (purpose) that slavery be facilitated need not be alleged. Plaintiffs candidly admit they cannot in good faith allege defendants acted with the specific intent to promote slavery and thus harm children.

The panel majority did not accept plaintiffs' assertion that knowledge that cocoa growers employed slavery makes out the *mens rea* element of aiding and abetting liability. Rather, they recognized that "two of our sister circuits have concluded that knowledge is insufficient and that an aiding and abetting ATS defendant must act with the *purpose* of facilitating the criminal act . . . ." *Id.* at 1023 (citing *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 399–400 (4th Cir. 2011);

---

[4] The technical assistance is not alleged to have included whips, chains, or other implements of slavery.

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009)). However, the majority decided that it need not reach the question whether knowledge was a sufficient *mens rea*, because plaintiffs' allegations met the purpose standard. In particular, though plaintiffs "conceded that the defendants did not have the subjective motive to harm children," and alleged only that "the defendants' motive was finding cheap sources of cocoa," the majority found that plaintiffs sufficiently alleged defendants had the *purpose* of aiding child slavery because of defendants' "myopic focus on profit over human welfare."[5] *Doe*, 766 F.3d at 1025–26. Thus, pursuit of profit over human welfare, in the majority's eyes, allows a jury to find the defendants specifically intended not merely to buy cocoa cheap, but to promote slavery as a means of buying cheap.[6]

---

[5] Plaintiffs allege four types of conduct that, taken together, are meant to show the defendants acted with the purpose of aiding and abetting slavery. First, the defendants bought the slavers' cocoa. Second, the defendants supplied the plantation owners with money, equipment and training for the cultivation of cocoa, while defendants knew the continued and expanded profitability of those farmers would facilitate the use of child slave labor; defendants continue to establish and honor those agreements today. Third, the defendants lobbied against Congressional efforts to curb the use of child slaves by, for example, opposing a bill that would require United States importers to certify and label their products "slave free." The companies instead urged and secured the adoption of a private, voluntary enforcement mechanism for "slave free" certification, similar to the regime for "fair trade" coffee imports into the U.S. Fourth, though the corporations have enough market power effectively to control Ivory Coast's cocoa markets, and could use that power to stop or limit the use of child slave labor if they so chose; they have taken no such action.

[6] The panel majority does not explain how this pleading could make plausible a finding of purpose to promote slavery in light of the concession from the plaintiffs that the defendants did not have the purpose of promoting slavery. *See Doe*, 766 F.3d at 1025. After all, one would

In so reasoning, regardless what the majority contends, it was most certainly *not* following *Aziz*. There, the Fourth Circuit noted that defendant Alcolac had sold chemicals that could be used to produce lethal mustard gas with full knowledge of that possible use, despite having been told that the chemical in question was subject to U.S. export restrictions. The chemical was sold to a company defendant Alcolac knew was a shell company designed to evade those export restrictions.

Through the shell company, the chemicals eventually reached Saddam Hussein's regime in Iraq, which used the chemicals to create mustard gas it then used to killed thousands of Kurds. *Aziz*, 658 F.3d at 390–91. Plaintiffs alleged, in sum, that Alcolac sold its chemicals "with actual or constructive knowledge that such quantities [of the chemicals] would ultimately be used by Iraq in the manufacture of mustard gas to attack the Kurds." *Id.* at 394. Nonetheless, the Fourth Circuit held plaintiffs had not adequately alleged purposeful violation of customary international law by Alcolac. *Id.* at 401. That is, the allegations that Alcolac knew how the chemicals would be used did not amount to an allegation that Alcolac harbored specific intent (i.e. purpose) that the Kurds be gassed, and thereby accomplish a form of genocide.

The contradiction with the majority's holding is obvious. If selling chemicals with the knowledge that the chemicals will be used to create lethal chemical weapons does not

---

assume that a panel, having concluded that the plaintiff must show purpose, would find that a plaintiff who concedes the defendant lacks that purpose has briefed himself out of his case. The panel majority's contrary decision is unexplained and, I submit, inexplicable.

constitute purpose that people be killed, how can purchasing cocoa with the knowledge that slave labor may have lowered its sale price constitute purpose that people be enslaved?  The majority replies that "the defendants [in *Aziz*] had nothing to gain from the violations of international law." *Doe*, 766 F.3d at 1024.  Demonstrably not so—the more Saddam Hussein used chemical weapons to kill his opponents, the more of Alcolac's chemicals he would need and thus the higher the sales of Alcolac's products; the higher their sales, of course, the higher their profit.[7]

The majority fares no better with its characterization of the Second Circuit's decision in *Talisman*, which should come as no surprise since the Fourth Circuit's *Aziz* opinion explicitly relied on *Talisman*.  *Aziz*, 658 F.3d at 398.  Talisman Energy ("Talisman"), a Canadian oil corporation, was part of a conglomerate that had a business arrangement with the Sudanese government whereby Talisman extracted oil in several regions of Sudan.  Talisman and its conglomerate worked closely with the Sudanese government: Talisman upgraded airstrips for the Sudanese government, who used the airstrips were used to conduct bombing raids on the ethnic South Sudanese; Talisman considered expanding its oil-exploration area into South Sudan despite knowing the government would kill the local inhabitants to give Talisman the land; Talisman paid royalties to the Sudanese government,  knowing the money would go to the

---

[7] The plaintiffs in *Aziz* alleged that Alcolac had sold one million pounds of its chemicals to the shell corporation, on the understanding that the shell corporation "intended to place further orders in the three to six million pound range annually." *Aziz*, 658 F.3d at 391.  It belies economic reality to suggest that an order of that size provides no benefit to the seller of goods.

continuation of the ethnic genocide[8] perpetrated by the government against the South Sudanese people; and, the conglomerate provided fuel to Sudanese government military aircraft taking off on bombing missions in pursuit of its genocidal aims. *Talisman*, 582 F.3d at 262. Nevertheless, the Second Circuit held that plaintiffs (Southern Sudanese victims of the government's attacks) had not shown Talisman had aided and abetted the Sudanese government's genocidal acts, because "[p]laintiffs d[id] not suggest in their briefs that Talisman was a partisan in regional, religious, or ethnic hostilities, or that Talisman acted with the purpose to assist persecution." *Id.* at 263. In distinguishing this case, the majority makes a point—Talisman was harmed by the government's genocidal conduct to the extent that it ultimately had to abandon its Sudanese venture, while Nestle continued its cocoa business.[9] *Doe*, 766 F.3d at 1024. But the Second Circuit also noted that "if ATS liability could be established by knowledge of those abuses coupled only with such commercial activities as resource development, the statute would act as a vehicle for private parties to impose embargos or international sanctions through civil actions in United States courts." *Talisman*, 582 F.3d at 294.[10]

---

[8] Genocide is a recognized violation of customary international law. *Abagninin v. AMVAC Chemical Corp.*, 545 F.3d 733, 739 (9th Cir. 2008).

[9] Of course, Talisman also benefitted from its relationship with the military; like any oil company doing business in a region prone to violence, it had to "rely on the military for defense." *Talisman*, 582 F.3d at 262.

[10] An embargo by chocolate manufacturers on Ivory Coast chocolate farmers is precisely the predictable economic effect plaintiffs' successful action would have. Indeed, failure to effect an embargo by refusing to deal with the plantation owners is precisely the misuse of economic power

By contrast, defendants here are alleged to have been aware that slavery was occurring on the cocoa plantations, but not to have done anything to assist directly in the enslavement of plaintiffs. Indeed, the plaintiffs in this case do not even allege that defendants could not have procured similar prices from the Ivorian plantations absent their use of slave labor—by technological innovations or the exercise of monopsony power, for instance.[11] By contrast, Talisman was required to acquiesce in the Sudanese government's misdeeds if it wanted to make a profit. It bears emphasis that Alcolac and Talisman undoubtedly knew that their actions were contributing to great evils: the use of poison gas in Alcolac's case, and genocide in Talisman's. Nonetheless, the Second and Fourth Circuit's decisions absolved these companies of ATS aiding and abetting liability, because plaintiffs' allegations did not make it plausible that defendants specifically intended Kurd or Southern Sudanese killings.

---

which the majority finds sufficient to make plausible the conclusion that defendants acted with the purpose to promote slavery. *Doe*, 766 F.3d at 1025.

[11] Nor can the panel majority rely for its answer on the plaintiffs' allegations that the corporations trained farmers and lobbied Congress. As to farmer training, the complaint alleges that two of the named defendants are attempting to *change* farming and labor practices in the Ivory Coast in an effort to reduce the use of child labor; the complaint contains no allegation that the third defendant has engaged in any farmer training at all. The panel majority cannot be inferring *pro-slavery* purpose from *anti-slavery* activity. As for the lobbying, plaintiffs themselves allege that the corporations' lobbying efforts had the *intent* of ensuring child labor free chocolate; the plaintiffs then allege that the defendants' lobbying had the *effect* of allowing child slavery to continue. That the corporations' lobbying is alleged to have backfired does not mean that the backfire was intended.

Thus, the panel majority's claim to have adopted the Second and Fourth Circuit's analysis is simply incorrect. It has not done so, and has thus created a circuit split on the proper *mens rea* element for aiding and abetting liability under customary international law.

Moreover, the majority is on the wrong side of the circuit split it creates. *Sosa* requires that the federal courts accept as proper bases of a claim for relief only those violations of customary international law that have "definite content and acceptance among civilized nations." Thus, if there is conflict as to the proper scope of ATS liability, the narrower reading should be chosen, as no consensus can be said to exist on the broader one. *Sosa*, 542 U.S. at 732. As the majority opinion recognizes, "the Rome Statute rejects a knowledge standard and requires the heightened *mens rea* of purpose, suggesting that a knowledge standard lacks the universal acceptance that *Sosa* demands."[12] *Doe*, 766 F.3d at 1024. The conflict between the Rome Statute's rejection of knowledge and the panel majority's effective acceptance of knowledge is sufficient to eliminate the required consensus. In its assessment of our sister circuits and its reading of Supreme Court precedent, therefore, the panel majority is well off the mark.

---

[12] The Rome Statute, 37 I.L.M. 999 (1998), is the treaty that establishes the International Criminal Court. The United States has signed but not ratified the treaty. In 2002, Under Secretary of State John Bolton sent a letter to then-UN Secretary General Kofi Annan which stated that the United States did not intend to become a party to the treaty and suspended the United States's signature. *See* Press Statement of Richard Boucher, United States Department of State, May 6, 2002, *available at* http://2001-2009.state.gov/r/pa/prs/ps/2002/9968.htm.

I turn next to the question of extraterritoriality—an important one in this case, since all the acts of enslavement and maintenance of slavery are alleged to have occurred outside United States borders. While this case was pending before the panel, the Supreme Court announced its decision in *Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659 (2013). The Supreme Court held in *Kiobel* that the presumption against extraterritoriality applies to claims brought under the ATS; as usual, that presumption is rebuttable.[13] *Id.* at 1669. To be viable, ATS claims must "touch and concern the territory of the United States" with "sufficient force to displace the presumption against extraterritorial application." *Id.* (citing *Morrison v. National Australia Bank*, 561 U.S. 247, 264–273 (2010)).

The plaintiffs claim *Kiobel*'s "touch and concern" language announces a new test to determine when the presumption against extraterritoriality is rebutted, while defendants argue *Kiobel* simply adopts the test announced in *Morrison*. *Morrison*'s text adopted a "focus" test, whereby courts must ask whether the defendants engaged in the conduct that is the focus of the statute at issue. *Morrison*, 561 U.S. at 266–67.[14] The panel majority adopted plaintiffs'

---

[13] This is the presumption that "when a statute gives no clear indication of an extraterritorial application, it has none." *Kiobel*, 133 S. Ct. at 1664 (brackets omitted) (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). That is, American statutes—the 1934 Securities Exchange Act or the 1797 Alien Tort Statute—do not apply to actions taken beyond our shores unless Congress tells us to the contrary.

[14] In *Morrison*, an Australian bank had purchased a Florida mortgage-servicing company, and listed the mortgage-servicing company's assets on its annual reports. It proudly touted the success of the mortgage-servicing company's business and gave it a high valuation. A few years

DOE V. NESTLE 15

view and held that "*Morrison* may be informative precedent for discerning the content of the touch and concern standard, but the opinion in *Kiobel II* did not incorporate *Morrison*'s focus test." *Doe*, 766 F.3d at 1028. Respectfully, the majority is quite wrong.

First, the Supreme Court's opinion in *Kiobel* counsels against the majority's analysis. As the Supreme Court's majority opinion states, though *Morrison* dealt with acts of Congress, "the principles underlying the [*Morrison*] canon of interpretation [which counsel against the Exchange Act's extraterritorial application] similarly constrain courts considering causes of action that may be brought under the ATS." *Kiobel*, 133 S. Ct. at 1664. Moreover, the Court's explanation of the "touch and concern" language is

---

later, however, the bank wrote down the value of the mortgage-servicing company's assets, causing the bank's share price to drop. *Id.* at 251–53. The plaintiffs, Australian shareholders in the bank, brought suit for violation of SEC Rule 10b-5, which states that it is unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." *Id.* at 262 (ellipses and brackets in original). The district court dismissed for lack of jurisdiction because the conduct occurred abroad, and the Second Circuit affirmed. The Supreme Court reclassified the issue as merits-based rather than jurisdictional, and affirmed. In light of the presumption against the extraterritorial applicability of federal law, the Court held that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.* at 266–67. Because the statute intended only to regulate domestic transactions and protect prospective parties to domestic transactions alone, the plaintiffs' claims, which arose out of deception occurring in Australia, between Australian buyers and sellers of Australian bank shares, were dismissed for failure to state a claim for relief.

encompassed in one citation to *Morrison*. *Id.* at 1669.[15] The meaning is clear: the Supreme Court stated that the *Morrison* presumption against extraterritorial application of American statutes is to be applied to ATS cases. And, since the

---

[15] *Kiobel* cites to pages 2883–88 of *Morrison*. In those pages, the Supreme Court explained why the Australian share fraud claims in *Morrison* did not have sufficient "contact with the territory of the United States." *Morrison*, 561 U.S. at 2884. The Court first noted that the principal purpose of the 1934 Securities and Exchange Act was to protect transactions on domestic exchanges, as Congress could not regulate foreign exchanges. Second, as to securities traded on foreign exchanges, the Securities Exchange Act was exclusively focused on domestic purchases and sales; here, the transaction had not occurred in the United States. *Id.* Furthermore, there was no contemporary statutory context suggesting that Congress's "comprehensive regulation of securities trading" was meant to encompass foreign transactions on securities not registered in the United States. *Id.* at 2885. Indeed, the strong risk of incompatibility with foreign law counseled against application of the Securities and Exchange Act to such transactions. *Id.* The Court further noted, in rejecting the test proposed by the Solicitor General ("SG"), the fact that the SG's test (which asked if "significant and material conduct" had happened in the United States) would open the floodgates of class action litigation for lawyers representing victims of foreign securities fraud. *Id.* at 2886. Finally, the Court explained that the consistency of the SG's proposed test with international law meant only that adoption of the SG's test would not violate international law, not that it was *required* by international law, and that the SEC's interpretation was not entitled to deference because it was based on cases which the Supreme Court had disapproved.

Thus, a court applying the *Morrison* test in the ATS context should focus on the location of the alleged violation of customary international law, statutory indicia that Congress intended U.S. courts to regulate the particular conduct at issue, the risk of an increase in future litigation, and the existence of a well-founded interpretation of applicable law to which the court should defer. All of these considerations point to the conclusion that plaintiffs' claims here lack sufficient contact with the territory of the United States.

presumptions are the same, it follows that the very same evidence is needed to rebut either presumption. Moreover, the *Kiobel* opinion cannot have imparted any additional meaning to the "touch and concern" test; the *Kiobel* majority did not apply the test or provide any further guideposts as to its possible meaning. Against this evidence, the panel majority points to the mere use of different language, as well as some language in the concurrences of Justices Kennedy and Alito in *Kiobel*, to claim a new but undefined test was created by the Court. *Doe*, 766 F.3d at 1028. This is too thin a reed on which to support such an expansive argument.

Second, the two circuits to consider this issue agree that *Kiobel* simply directs application of the *Morrison* test; the panel majority's contrary conclusion thus creates another circuit split. In *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229 (11th Cir. 2014), the Eleventh Circuit noted that "[t]he Court in *Kiobel* looked to *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), for a discussion of when claims that 'touch and concern the territory of the United States' do so 'with sufficient force to displace the presumption against extraterritorial application.'"[16] *Id.* at

---

[16] Baloco was a Colombian national and the child of a union leader who worked for Drummond Ltd. at Drummond's coal mining operation in Colombia. Drummond is a closely-held corporation with its principal place of business in Alabama. The union leader was murdered, Baloco alleged, by paramilitary members of the AUC, an organization affiliated with Colombia's military which provided security for Drummond's coal mining operation and was engaged in a guerrilla war with FARC. Baloco brought suit under the ATS, Trafficking Victims Protection Act, and Colombia's wrongful death statute. The district court granted Drummond's motion to dismiss Baloco's ATS claims for lack of subject matter jurisdiction under 12(b)(1). The Eleventh Circuit affirmed. The court adopted the presumption that the ATS statute did not touch murders occurring outside the United States, and applied the *Kiobel* "touch and

1236–37 (quoting *Kiobel*, 133 S. Ct. At 1669).  Similarly, in *Mastafa v. Chevron Corp.*, 770 F.3d 170, 182–86 (2d Cir. 2014), the Second Circuit applied the *Morrison* "focus" test in a post-*Kiobel* ATS case to determine if the presumption against extraterritoriality had been rebutted.[17]

_____

concern the territory of the United States" standard to see if the presumption was rebutted.  The court explained that "[t]he [Supreme] Court in *Kiobel* looked to *Morrison* for a discussion of when claims that 'touch and concern the territory of the United States' do so 'with sufficient force to displace the presumption against extraterritorial application." *Baloco*, 767 F.3d at 1236–37 (quoting *Kiobel*, 133 S. Ct. at 1669). Examining the allegations of Baloco's complaint, Baloco's "claims are not focused within the United States" because the killings occurred in Colombia in the context of a guerrilla war in Colombia.  *Baloco*, 767 F.3d at 1237–38.

[17] Mastafa was an Iraqi woman who was the victim of torture by agents of Saddam Hussein's regime in Iraq.  She brought suit against Chevron, alleging that it paid kickbacks and other unlawful payments to the regime which enabled the regime to survive and torture her.  The district court granted Chevron's 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, and the Second Circuit affirmed.  The court explained that the Supreme Court's decision in *Kiobel* "significantly clarified the jurisdictional grant of the ATS with respect to extraterritoriality." *Mastafa*, 770 F.3d at 181–82.  The court noted that in *Kiobel*, the Supreme Court had not explained how this presumption could be displaced; "[t]o determine how to undertake the extraterritoriality analysis where plaintiffs allege some 'connections' to the United States, we first look to the Court's opinion in *Morrison*." *Id.* at 183.  The circuit interpreted the *Morrison* methodology as requiring that the conduct which touched and concerned the territory of the United States *be* the conduct which gave rise to ATS liability.  The circuit then concluded that the only conduct alleged in the complaint which touched and concerned the United States (maintenance of escrow accounts and arrangement of payments in New York bank accounts) did not constitute a violation of customary international law. Thus, the district court correctly concluded that it lacked subject matter jurisdiction.  Applied here, the only conduct of defendants which touched and concerned the U.S. were (1) sales of cocoa products in the US and

The panel majority's analysis thus puts our court on one side of yet another circuit split; yet again, the majority has taken the minority, incorrect side.[18]

Finally, I note that this case squarely presents the question whether ATS liability should extend to corporations.[19]  Our court's earlier affirmative answer to this question in the panel was vacated by the Supreme Court, making this a question of first impression in this circuit.  *Sarei v. Rio Tinto PLC*, 671 F.3d 736, 748 (9th Cir. 2011) (en banc), *vacated by*

---

(2) lobbying efforts in the Congress.  Neither sales nor lobbying are even colorable violations of customary international law.

[18] There is one other court to have opined on this issue: the Fourth Circuit, in *Al Shimari v. CACI Premier Technology, Inc.*, 758 F.3d 516 (4th Cir. 2014).  The paragraphs in which the Fourth Circuit decided that the *Morrison* presumption against extraterritorial application was rebutted do not cite the "focus" test; of course, those paragraphs *also* do not cite the "touch and concern" test.  *Id.* at 528–29.  However one interprets the Fourth Circuit opinion, it does not affirmatively hold that "the opinion in *Kiobel II* did not incorporate *Morrison*'s focus test."  *Doe*, 766 F.3d at 1028.  The majority opinion in this case is the first to come to that conclusion.  And the panel majority is the first to hold that *Kiobel* necessitates remand of the case to decide whether the presumption against extraterritoriality has been vacated, a conclusion the Fourth Circuit did *not* reach.

[19] A circuit split exists on whether the ATS's grant of jurisdiction extends to claims against corporations.  *Compare, e.g.*, *Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013, 1021 (7th Cir. 2011) ("[C]orporate liability is possible under the Alien Tort Statute . . . .") *with Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 148–49 (2d. Cir. 2011) ("[C]orporate liability has not attained a discernable, much less universal, acceptance among nations of the world in their relations *inter se*, and it cannot, as a result, form the basis of a suit under the ATS.").

133 S. Ct. 1995 (2013).[20]   The panel majority chose to
"reaffirm the corporate liability analysis" of *Sarei*.  *Doe*, 766
F.3d at 1021.  Here again, the majority has erred.

The *Sarei* analysis, as the majority adopts it today, comes
in three parts.  First, the analysis of customary international
law is norm-by-norm, as "there is no categorical rule of
corporate immunity or liability" in ATS cases.  *Id.*  Second,
corporate liability can be imposed in the absence of
"international precedent enforcing legal norms against
corporations."[21]   *Id.*  Third, norms that are "'universal and

---

[20] *Sarei* was vacated in light of the Supreme Court's decision in *Kiobel*
and the opinion was not reinstated on remand.  *Sarei v. Rio Tinto*,
722 F.3d 1109 (9th Cir. 2013) (en banc).  Instead, "a majority of the en
banc court" voted to affirm the district court's judgment of dismissal with
prejudice without any further explanation.  Thus, the original *Sarei* en
banc opinion has no precedential effect.

[21] In the *Sarei* en banc court's words, "[t]hat an international tribunal has
not yet held a corporation criminally liable does not mean that an
international tribunal could not or would not hold a corporation criminally
liable under customary international law."  *Sarei*, 671 F.3d at 761.  Of
course, as the *Sarei* opinion did not state, that an international tribunal has
not yet held a corporation criminally liable does not mean that an
international tribunal *would* hold a corporation criminally liable, either.
And as the Second Circuit noted in *Kiobel*, the *Sarei* panel's factual
premise was incorrect: the refusal to extend liability to corporations like
IG Farben, which aided and abetted Nazi war crimes, was "not a matter
of happenstance or oversight," but a careful decision reflecting the central
moral principle of holding men, not "abstract entities," accountable for
evil actions.  *Kiobel*, 621 F.3d at 134–35.

Moreover, as I discuss below, *Sarei*'s willingness to rush ahead of
international tribunals' declarations of law is inconsistent with the
Supreme Court's cautious mood in *Sosa*.

absolute,' or applicable to 'all actors,' can provide the basis for an ATS claim against a corporation." *Id.*

There are many problems with this approach. Our court was wrong enough in *Sarei* to join those circuits which held that corporate liability could exist under the ATS. But even amongst those circuits that erroneously conclude that corporate liability can exist under the ATS, the *Sarei* approach resuscitated by the panel majority distinguishes itself as particularly erroneous, in two ways.

First, the Court has explained that a norm cannot give rise to ATS liability unless it is "specific, universal, and obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 (2004) (quoting *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994)). Well and good. In this case, the panel majority finds that the norm against slavery is sufficiently specific, universal, and obligatory to give rise to ATS liability. *Doe*, 766 F.3d at 1022. I agree. The majority then says that *because* of the "categorical nature of the prohibition on slavery and the moral imperative underlying that prohibition," corporations must be liable for aiding and abetting slavery. *Doe*, 766 F.3d at 1022. But this is circular reasoning: by the panel's reasoning, any norm "categorical" enough to give rise to an ATS claim based on customary international law necessarily gives rise to corporate liability for violation of that norm. And worse yet, the majority's reasoning contradicts the Supreme Court's teaching in *Sosa* that there must be a meaningful inquiry—not a mere labeling of norms as 'categorical'—as to whether the particular international norm at issue, which is assumed to confer liability under the ATS generally, would allow for corporate liability in particular. *Sosa*, 542 U.S. at 732 n.20.

Second, the *Sarei* opinion rested its analysis on common sense inference about "congressional intent when the ATS was enacted." *Sarei*, 671 F.3d at 761. Because Congress could not have anticipated the "array of international institutions that impose liability on states and non-state actors alike in modern times," the *Sarei* panel refused to be bound "to find liability only where international fora have imposed liability." *Id.* But this approach is forestalled by *Sosa*'s reminder that federal courts have "no congressional mandate to seek out and define new and debatable violations of the law of nations." *Sosa*, 542 U.S. at 728. In light of the cautious mood expressed by *Sosa*, therefore, a desire to "get ahead" of international law cannot be followed.

In sum, the majority's error violates the Supreme Court's commands and opens our doors to an expansive vision of corporate liability.[22]

We do the law a disservice when we allow our sympathies, no matter how well-founded, to run our decisions afoul of the Supreme Court's unequivocal commands. Because this court has done such a disservice by refusing to take this case en banc, I respectfully dissent.

---

[22] More expansive, even, than the *Sarei* decision that the Court vacated. In the *Sarei* en banc opinion, we first noted that there was an international norm against war crimes, then noted international law cases which recognized aiding and abetting liability *for war crimes*. *Sarei*, 671 F.3d at 763–66. By contrast, the panel majority here finds an international norm against slavery and a general international law principle of aiding and abetting liability—without finding such liability applied to *slavery*—and finds those two sufficient to give rise to liability. Thus, the panel imposes liability for aiding and abetting slavery without citing a single case in which an international tribunal recognized the applicability of this form of liability for this particular norm.